FILED

2026 Jun-23  PM 02:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| ASTRID McELROY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 7:24-cv-591-GMB |
| | ) | |
| THE BIBB COUNTY HEALTH | ) | |
| CARE AUTHORITY, d/b/a Bibb | ) | |
| Medical Center, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Astrid McElroy filed a complaint alleging violations of Title VII of the Civil Rights Act ("Title VII") by Defendant The Bibb County Health Care Authority, d/b/a Bibb Medical Center ("BMC"). Doc. 1.  The parties consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 13.  Before the court is BMC's Motion for Summary Judgment. Doc. 21.  The motion is fully briefed (Docs. 22, 26 & 27) and due to be granted.

**I.  STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended." *Tippens v.*

*Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view

2

all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). On the other hand, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## II.  STATEMENT OF RELEVANT FACTS

McElroy is a member of the Church of God—Preparing for the Kingdom of God. Doc. 22-1 at 13. This is "a very small church" without a traditional congregation. Doc. 22-1 at 13. Its members, including McElroy, observe the Sabbath "from Friday sunset to Saturday sunset" and "do not do any kind of work that forms an income" during that time. Doc. 22-1 at 14. McElroy explained that

"you are allowed to make your bed, cook dinner, wash the dishes, basic care of the family, feed the animals" but "[y]ou would not do your laundry, you would not mow the lawn, earn any kind of money" or even "go to a football game." Doc. 22-1 at 14. McElroy has strictly observed the Sabbath since 1979. Doc. 22-1 at 14–15.

## A.    BMC Hiring Event

In late January 2023, BMC hosted a walk-in hiring event to meet and recruit prospective applicants for various jobs at BMC, including Certified Nursing Assistant ("CNA") positions and Patient Care Technician ("PCT") positions. Doc. 22-1 at 16; Doc. 22-2 at 18. BMC intended to fill CNA vacancies at its nursing home and PCT vacancies at its hospital. *See* Doc. 22-5 at 3. Both positions would provide direct nursing care to patients and perform clinical tasks. Doc. 22-5 at 2–3, 5–9. The CNA position requires that the candidates receive a certification from the State of Alabama as a CNA "or be eligible to be enrolled in the classes offered by the facility to become certified." Doc. 22-5 at 5. The PCT position, on the other hand, does not require a certification. Doc. 22-5 at 3. The two positions have the same pay scale, are eligible for the same benefits, and have the same supervisory structure. Doc. 22-5 at 3.

McElroy attended the hiring event and expressed interest in a CNA position. Doc. 22-1 at 15–16. At the event, McElroy met Michelle Rogers, BMC's Director of Human Resources. Doc. 22-1 at 16; Doc. 22-2 at 18. McElroy and Rogers talked

4

about McElroy's previous experience in home health, the CNA course and position, and McElroy's religious observances. Doc. 22-1 at 16–19. McElroy explained that she was not a certified CNA but had always wanted to be one. Doc. 22-1 at 16. Rogers said that McElroy would need to take a course and pass the exam to become certified. Doc. 22-1 at 17. McElroy told Rogers she could not work from Friday sunset to Saturday sunset but would be able to work on holidays like Christmas, Thanksgiving, and Easter. Doc. 22-1 at 17–18. Rogers said that "they could work around working on the Sabbath if [she] could do the other days." Doc. 22-1 at 19.

After the event, Rogers set up a meeting with McElroy to complete paperwork and meet with two BMC administrators. Doc. 22-1 at 19. McElroy arrived at BMC and waited in a conference room along with the other candidates. Doc. 22-1 at 20. After some time, Rogers told her that the "two people from administration were otherwise detained and that they would not be coming. So we couldn't do the paperwork." Doc. 22-1 at 20. Rogers told McElroy she could complete the paperwork the following Monday when she attended CNA classes. Doc. 22-1 at 20.

**B.    CNA Classes**

BMC offered CNA classes for any candidates who were not certified. *See* Doc. 22-3 at 4. They did not have to pay for the course up front but would "have to work back X amount of years." Doc. 22-1 at 19. The CNA class ran from Monday, February 20, through Sunday, March 12, and included 15 days of instruction for a

total of 90 hours of class. Doc. 22-3 at 8, 20–21.  If anyone "misses 20 hours of the program they have to be cut from the program" according to Alabama Department of Public Health guidelines. Doc. 22-3 at 8.

BMC does not routinely offer makeup classes but "if someone has to leave early, they miss an hour or two hours . . . then sometimes we can work it out." Doc. 22-3 at 8.  For example, exceptions have been made when someone had a death in the family or had to take a child to the hospital. Doc. 22-1 at 8.  Otherwise, "if they miss . . . that much time . . . they are going to need to wait till the next class." Doc. 22-3 at 8.  Three of the scheduled classes (consisting of 24 hours of class time) conflicted with McElroy's Sabbath observance. *See* Doc. 22-3 at 9, 20–21.

## C.    Conflicts with Sabbath Observance

A few days before the CNA classes began, Rogers spoke with the Director of Nursing at the BMC nursing home about the CNA position. Doc. 22-2 at 24–25. Rogers asked whether it was an absolute requirement for the CNAs to be available to work every other weekend.[1] Doc. 22-2 at 25.  The Director confirmed this requirement and told her "that if we did not require that all of our staff work every other weekend in our nursing home facility, then we would have so much overtime it would cause financial issues for the company or we [would have] to outsource to staffing agencies." Doc. 22-2 at 25.

---

[1] Weekend work includes both Saturdays and Sundays. Doc. 22-2 at 26.

After this conversation, Rogers sent McElroy an email. Doc. 22-1 at 22 & 85. Rogers wrote that "[a]s much as we would love to have you in the classes and to work with us, there is just no way that we would be able to accommodate you not working at least every other weekend.  Right now, our CNAs are required to work at least every other weekend, which I know you said you were unable to do." Doc. 22-1 at 85.  She then asked McElroy if she "would be interested in working as a patient care technician with [BMC] in the hospital." Doc. 22-1 at 85.  Rogers told McElroy that the PTC position involved the same type of work as the CNA position but did not require a certification. Doc. 22-1 at 85.  Rogers also wrote that "[w]e may also be able to work more so with your schedule"[2] if McElroy chose a PTC position. Doc. 22-1 at 85.  She asked McElroy to let her know what she thought about "this opportunity." Doc. 22-1 at 85.

When she responded to the email, McElroy expressed her disappointment in not being able to take the CNA classes. Doc. 22-1 at 23 & 84.  She then asked Rogers when they could "get together to talk about the patient care technician position." Doc. 22-1 at 23 & 84.  Rogers did not immediately respond to the email because she

---

[2] Rogers explained:

> At this time—as of 2023—we had a different Director over the department and there was a little bit more flexibility with scheduling.  We had several long-time employees that only wanted to work weekends and several that only wanted to work during the week when it came to the PCT position.  So ultimately, it's not up to me regarding the schedule, but I did know there may be a little bit more flexibility, and I was hoping that she may be able to do that.

Doc. 22-2 at 28.

was out of the office. Doc. 22-1 at 84. Once she returned to work, Rogers replied to McEloy's email and asked whether McElroy was "still possibly interested in interviewing for a Patient Care Technician position with" BMC. Doc. 22-1 at 84. McElroy never responded to this email.[3] Doc. 22-1 at 25–26. McElroy testified that she "decided not to go with that position" because of her independent internet research[4] into the duties of a PCT. Doc. 22-1 at 23.

Even though McElroy knew that BMC could not accommodate her Sabbath observance in the CNA position, she went to the location for the CNA classes on the first day. Doc. 22-1 at 28. When she arrived, she saw a woman exiting the building. Doc. 22-1 at 28. McElroy approached her and asked, "Is this where the classes are for the new courses?" Doc. 22-1 at 28. The woman confirmed McElroy was in the right place and introduced herself as Barbara Terry, the instructor. Doc. 22-1 at 28. When McElroy told her she was there for the CNA course, Terry asked if she was willing to work on Saturdays.[5] Doc. 22-1 at 28. When McElroy responded that she could not work Saturdays, Terry stated, "you can't be a nurse if you don't work on Saturdays." Doc. 22-1 at 28. McElroy told Terry this policy is "religious

---

[3] Apparently, McElroy intended to send a response declining Rogers' invitation to apply for the PCT position. Doc. 22-1 at 23–26 & 84–85. It is undisputed, however, that McElroy did not respond to this email.

[4] McElroy testified that she completed a general Google search. Doc. 22-1 at 24. She did not look the job posting for PCTs at BMC. Doc. 22-1 at 24.

[5] Based on this question, McElroy assumed that Terry had spoken with Rogers before she arrived. Doc. 22-1 at 28.

discrimination," and after a brief back-and-forth, McElroy got in her car and drove to Rogers' office. Doc. 22-1 at 28–29.  No one was at BMC when McElroy arrived. Doc. 22-1 at 29.  She waited for approximately one hour before leaving. Doc. 22-1 at 29.

### III.  DISCUSSION

Title VII forbids religious discrimination in employment: "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a).  The statute defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).  Title VII also requires employers to accommodate the religious observances or practices of applicants and employees. *See* 42 U.S.C. §§ 2000e-2(a) & 2000e(j).  The statutory scheme generally does not allow an employer to hide behind a religion-neutral policy. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015) ("Title VII does not demand mere neutrality with regard to religious practices . . . . Rather, it gives them favored treatment . . . .").  In short, "'Title VII imposes on employers both a negative duty not to discriminate' because of an individual's religion 'and a positive duty to accommodate' h[er] religious practices." *Staple v. Sch. Bd. of Broward County, Fla.*,

9

2024 WL 3263357, at *3 (11th Cir. July 2, 2024) (quoting *Hebrew v. Tex. Dept. of Crim. Just.*, 80 F.4th 717, 721 (5th Cir. 2023)).

McElroy asserts a claim that the United States Supreme Court characterizes as a "disparate-treatment claim based on failure to accommodate." *Abercrombie*, 575 U.S. at 771.  The "rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." *Id*. at 773.  This means an "employer violates Title VII" if the applicant "requires an accommodation of [a] religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor" in the decision not to hire the employee. *Id*. at 773–74.  "To establish a reasonable-accommodation claim of religious disparate treatment, a plaintiff must first set forth a *prima facie* case by showing that (1) h[er] sincere and bona fide religious belief conflicted with an employment requirement, and (2) [the prospective] employer took adverse employment action against h[er] because of h[er] inability to comply with the employment requirement or because of the employer's perceived need for h[er] reasonable accommodation." *Bailey v. Metro Ambul. Servs., Inc.*, 992 F.3d 1265, 1275 (11th Cir. 2021) (citing *Abercrombie*, 575 U.S. at 773).  If the plaintiff establishes a *prima facie* case, "the burden shifts to the employer to show that it either offered a reasonable accommodation or that it cannot reasonably

accommodate the employee's religious practice without undue hardship on its business." *Bailey*, 992 F.3d at 1275 (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986)).  A reasonable accommodation is one that "eliminates the conflict between employment requirements and religious practice." *Philbrook*, 479 U.S. at 70.  If an employer offered a reasonable accommodation for the employee's religious practice, it is entitled to judgment in its favor. *Bailey*, 992 F.3d at 1275. The employer has no obligation to offer an employee's preferred accommodation or to demonstrate that an employee's preferred accommodation would cause an undue hardship. *Id*.

The parties do not dispute that McElroy can establish a *prima facie* case of religious discrimination. *See* Doc. 22 at 17–18.  McElroy held a sincere and bona fide religious belief that prohibited her from working from sunset on Friday to sunset on Saturday.  This belief conflicted with the CNA job requirement of working two weekends per month.  And BMC told McElroy that it could not "accommodate [her] not working at least every other weekend." Doc. 22-1 at 85.  This evidence satisfies the *prima facie* requirements.

The contested issue, however, is whether BMC offered McElroy a reasonable accommodation for her religious practices.  BMC contends that its suggestion of the PCT position satisfies its obligation to offer a reasonable accommodation. Doc. 22 at 20–21.  In addition, BMC argues that McElroy's abandonment of the offered

11

accommodation defeats her claim. Doc. 22 at 21–22.  McElroy disagrees and claims that BMC never officially offered her the PCT position. Doc. 26 at 17–20.  The court agrees with BMC.

"By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Jean-Pierre v. Naples Comm. Hosp., Inc*., 817 F. App'x 822, 826 (11th Cir. 2020) (quoting *Philbrook*, 479 U.S. at 68) (emphasis omitted).  But because Title VII does not define "reasonably accommodate, 'the precise reach of the employer's obligation to its employee is unclear under the statute and must be determined on a case-by-case basis.'" *Morrissette-Brown v. Mobile Infirmary Med. Ctr*., 506 F.3d 1317, 1321–22 (11th Cir. 2007) (quoting *Beadle v. Hillsborough County Sheriff's Dept.*, 29 F.3d 589, 592 (11th Cir. 1994)).  Nevertheless, a transfer to a "comparable position" that removes the conflict between the policy and the religious practice, and reasonably preserves the employee's terms, conditions, or privileges of employment, satisfies the reasonable-accommodation requirement." *Bailey*, 992 F.3d at 1276 (citing *Philbrook*, 479 U.S. at 71; *EEOC v. United Parcel Serv*., 94 F.3d 314, 318–20 (7th Cir. 1996)).  "Title VII does not require an employer to give an employee a choice among several accommodations." *Beadle*, 29 F. 3d at 592 (citing *Philbrook*, 479 U.S. at 68).

In addition, an employer's encouragement to obtain new employment within

12

the company may be a reasonable accommodation, especially when coupled with an offer of assistance. *See Walden v. Centers for Dis. Contr. & Prev.*, 669 F.3d 1277, 1294 (11th Cir. 2012), *abrogated on other grounds by Abercrombie*, 575 U.S. 768 (2015); *Morrissette-Brown*, 506 F.3d at 1324. For example, in *Walden*, 669 F.3d at 1282, the employer laid off an employee instead of terminating her while "provid[ing] resources to help her find another job within the company." The Eleventh Circuit held that the employer provided a reasonable accommodation because it "encouraged its employee to seek another position with the company and provided assistance in that search." *Id*. at 1294. Similarly, in *Morisette-Brown*, 506 F.3d at 1324, the employer "encouraged [the employee's] transfer to another position . . . even though it had a requirement that an employee work at least twelve months in a position before transferring to another position." And the Director of Employee Relations for the employer "asked [the employee] to review the open-positions list and to let him know which jobs she was interested in, and he would do his 'best' to process the requests and to secure interviews for the positions." *Id*. The Eleventh Circuit held that the offer to transfer with the additional assistance of the director and the waiving of the 12-month requirement amounted to an offer of a reasonable accommodation. *Id*.

Here, BMC offered a reasonable accommodation to McElroy—an invitation for her to apply for the PCT position—and she rejected it. Despite McEloy's internet

13

research, the record reflects that a PCT position at BMC is comparable to a CNA position.  Both jobs focus on providing direct nursing care to patients and performing clinical tasks, and they have the same pay scales, are eligible for the same benefits, and report to the same supervisory positions. Doc. 22-5 at 2–3, 5–9.  Because of her rejection out of hand of a PCT position, McElroy never received an official offer,[6] nor did she give BMC the chance to offer additional assistance.  Under these circumstances, McElroy's refusal to apply for the position absolved BMC from any further obligation to accommodate her. *See Israel v. Grand Peaks Prop. Mgmt.*, 2024 WL 4533604, at *7 n.8 (S.D. Fla. Oct. 21, 2024) (finding no discrimination where "the record clearly shows that Grand Peaks offered a reasonable accommodation to Ms. Israel for her religious beliefs, but she rejected or otherwise failed to avail of herself of that accommodation"); *see also Beadle*, 29 F.3d at 593 (holding that an employer has a duty to make reasonable accommodations, but the employee has a corresponding "duty to make a good faith attempt to accommodate h[er] religious needs through means offered by the employer").

McElroy argues that BMC has not established the PCT position could accommodate her religious beliefs. Doc. 26 at 19–20.  She points to Rogers'

---

[6] McElroy's argument that BMC did not accommodate her because it never officially offered her the position (Doc. 26 at 19) is unpersuasive. *See Morisette-Brown*, 506 F.3d at 1324 (asking an employee to "review the open-positions list and to let him know which jobs she was interested in, and [that] he would do his 'best' to process the requests and to secure interviews for the positions" met the reasonable accommodation standard).

statement that BMC "may also be able to work more so with your schedule" in the PCT position (Doc. 22-1 at 85) and argues that the offer was not a reasonable accommodation because Rogers "didn't know for certain" if the position would accommodate her Sabbath observance.[7] This argument fails because McElroy did not pursue the PCT position, and this decision is the reason there is no definitive

---

[7] It is unresolved in the Eleventh Circuit whether a reasonable accommodation requires the complete elimination of the conflict between the religious practice and the employment requirement, and the other courts of appeals have come to different conclusions on this issue depending on the factual scenario. For example, the Second, Fourth, Sixth, and Tenth Circuits have held that an offer to allow an employee to work on fewer Saturdays is not a reasonable accommodation when her religion prohibits her from working on any Saturday. *See Benton v. Carded Graphics, Inc.*, 28 F.3d 1208 (4th Cir. 1994) ("[O]ffers to reduce the number of working Saturdays to as few as possible would not accommodate an employee whose religion prohibits working on any Saturday."); *Crider v. Univ. of Tenn.*, 492 F. App'x 609, 613 (6th Cir. 2012) ("Offering [the plaintiff] fewer Saturday shifts is not a reasonable accommodation to religious beliefs which prohibit working on Saturdays."); *Tabura v. Kellogg USA*, 880 F.3d 544, 550 (10th Cir. 2018) ("In this case, an accommodation will not be reasonable if it only provides Plaintiffs an opportunity to avoid working on some, but not all, Saturdays."); *Baker v. The Home Depot*, 445 F.3d 541, 547–48 (2d Cir. 2006) ("[T]he shift change offered to [the plaintiff] was no accommodation at all because, although it would allow him to attend morning church services, it would not permit him to observe his religious requirement to abstain from work totally on Sundays."). But some of these courts stop short of requiring that an accommodation must completely remove a religious conflict to be reasonable. For example, the Fourth Circuit rejected totality as inconsistent with the modifier "reasonably," which Title VII uses to describe the requisite accommodation in question. *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 313 (4th Cir. 2008). And while the Supreme Court in *Philbrook* held an accommodation is reasonable if it eliminates a religious conflict, the Eighth and Tenth Circuits have observed that it did not adopt the reciprocal holding—that an accommodation is not reasonable if it does not entirely eliminate a religious conflict. *See Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1030–31 (8th Cir. 2008) (ultimately holding that "[w]hat is reasonable depends on the totality of the circumstances and therefore might, or might not, require elimination of a particular, fact-specific conflict"); *Tabura*, 880 F.3d at 551–52 (citing *Sturgill*).

The Eleventh Circuit has not taken a side in this debate. Instead, while acknowledging the use of the verb "eliminate" in *Philbrook*, the court in *Patterson v. Walgreen Company*, 727 F. App'x 581, 586–87 (11th Cir. 2018), held that "[g]uarantees are not required. And the record does show that even if moving [the plaintiff to different position] did not completely eliminate the conflict, it would have enhanced the likelihood of avoiding it." The same can be said here.

evidence as to whether BMC could accommodate her religious observation. Instead, the only evidence on point is Rogers' explanation that the position had more scheduling flexibility because there were "several long-time employees that only wanted to work weekends and several that only wanted to work during the week when it came to the PCT position." Doc. 22-2 at 28. For this reason, any argument that the position could not accommodate McElroy's Sabbath observance is pure speculation and cannot create a genuine issue of material fact. *See Tana v. Dantanna's*, 611 F.3d 767, 775 n.7 (11th Cir. 2010) (explaining that a nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is "merely colorable" or "not significantly probative").

Because BMC provided McElroy with a reasonable accommodation, it is entitled to judgment in its favor. *Bailey*, 992 F.3d at 1275. BMC has no further obligation to demonstrate that McElroy's preferred accommodation would cause an undue hardship. *Id*. Summary judgment is due to be granted in BMC's favor.

## IV. CONCLUSION

For these reasons, the Motion for Summary Judgment (Doc. 21) is due to be granted. A separate final order will be entered.

DONE and ORDERED on June 23, 2026.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

16